**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**JAMES A. YERK**
        **Plaintiff,**

      **v.**                                **Case No. 14-C-1216**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**
              **Defendant.**

---

## DECISION AND ORDER

Plaintiff James Yerk applied for social security disability benefits, claiming that he could no longer work due to a shoulder injury and depression, but the Social Security Administration ("SSA") denied his application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. Plaintiff requested review by the Appeals Council, submitting additional evidence in support of his claim, but the Council denied review. Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in evaluating the credibility of his allegations and in determining his residual functional capacity ("RFC"), and that the Council erred in rejecting his new evidence.

## I. FACTS AND BACKGROUND

### A. Medical Evidence

Plaintiff injured his shoulder at work in August 2006. (Tr. at 376, 400.) The injury failed to respond to conservative treatment, and a May 1, 2008, MRI revealed degenerative changes at the acromioclavicular joint, with mild impingement on the supraspinatus muscle; a benign lesion at the metaphyseal region of the humerus; and a cluster of tiny intraosseous

cysts close to the insertion of the supraspinatus muscle on the head of the humerus. (Tr. at 284-85.)

On May 29, 2008, plaintiff saw Dr. John Horan, an orthopedist, in consultation, reporting a two year history of pain in his right shoulder. He had received multiple treatments, including medication, cortisone shots, and physical therapy. He reported numbness, weakness, and pain all the time. Percocet no longer helped, even though he took twice as many as indicated. He was currently using Vicodin, which helped somewhat. On exam, he had positive impingement sign and was tender to adduction of his arm. He was neurovascularly intact to his fingers. Dr. Horan found plaintiff's condition consistent with chronic impingement or rotator cuff repair. Plaintiff had failed conservative treatment, so surgical intervention was indicated. Dr. Horan planned an acromioplasty and distal clavicle excision with and without rotator cuff repair. (Tr. at 263.)

On June 24, 2008, plaintiff underwent a pre-operative evaluation (Tr. at 322-24), and on June 30, 2008, Dr. Horan performed the surgery. Dr. Horan listed pre-operative diagnoses of chronic impingement, right shoulder, and degenerative joint disease, right acromioclavicular joint. He performed an acromioplasty, right shoulder, and right distal clavicular excision. (Tr. at 325.) Plaintiff tolerated the procedure well and was transferred to the recovery room in stable condition. (Tr. at 326.)

On July 15, 2008, plaintiff returned to Dr. Horan for follow up with no complaints. He appeared to be doing reasonably well in the early post-operative period. He was to start physical therapy in two weeks and return to the office in six weeks, entertaining his return to work at that time. (Tr. at 256.)

On July 29, 2008, plaintiff started physical therapy, with a chief complaint of difficulty sleeping. He noted increased pain when not wearing a sling. He was unable to raise his arm

up overhead and complained of pain in the right biceps region. (Tr. at 286.) He commenced twice weekly sessions with the goal of decreasing pain and improving range of motion. (Tr. at 287.) On August 18, plaintiff reported continued pain but had made progress in range of motion. (Tr. at 290.)

On August 19, 2008, plaintiff returned to Dr. Horan, reporting continued pain and stiffness in the shoulder. On exam, his incision was well-healed, he was neurovascularly intact, and he had a positive impingement sign. He had external rotation of about 10 degrees and forward flexion of about 95. Dr. Horan found him to be making extremely slow progress in his post-operative physical therapy. Dr. Horan injected plaintiff's right shoulder, with good initial relief of symptoms. Plaintiff was to continue in physical therapy and return in four weeks. (Tr. at 255.)

On September 2008, plaintiff's therapy was continued to focus on strengthening. (Tr. at 289, 294.) On October 7, he reported reduced pain, and the therapist noted that he had shown good tolerance to advanced strengthening. (Tr. at 288.)

On October 9, 2008, plaintiff returned to Dr. Horan, reporting almost no pain and doing more and more work, actually violating the restrictions he had. He had been doing his strengthening exercises and was making good progress. On exam, his range of motion was full, impingement sign negative, and with no tenderness to adduction of the arm across the body. He appeared to be doing well and would return in 60 days. Dr. Horan released him with no restrictions. (Tr. at 254.) On October 10, plaintiff discharged from physical therapy to a home exercise program. (Tr. at 291.)

On November 4, 2008, plaintiff followed up with Dr. Horan, reporting that he did well for the first two weeks back to full duty work but then started having increasing pain. On exam, his range of motion was full, impingement sign moderate, neurovascularly intact,

incision well-healed, with no edema.  Dr. Horan found the recurrence likely due to his increased workload.  He provided an injection with good initial relief of symptoms.  (Tr. at 253.)

On December 4, 2008, plaintiff advised Dr. Horan that he had some anterior soreness but was able to do full duty work without much difficulty.  On exam, his range of motion was full in all planes.  He had tenderness along the bicipital groove, which radiated into the muscle belly of the biceps.  He had no edema, erythema, or effusion.  Dr. Horan believed him to be doing quite well.  (Tr. at 252.)

However, on May 8, 2009, plaintiff saw Dr. Todd Bradshaw, his primary care physician, complaining of chronic shoulder pain.  He reported not having the response expected from the surgery.  He continued to have a lot of pain, not responding to Ibuprofen.  On exam, his range of motion was diminished because of discomfort but passively they could get decent range of motion.  Dr. Bradshaw ordered imaging to check the source of the problem.  (Tr. at 348, 356.)  He also provided Percocet to use as needed, but the goal was not to use it long term.  (Tr. at 355-56.)

A May 16, 2009, MRI revealed post-operative changes; probable inflammation and/or prior trauma involving the supraspinatus without clear evidence of a full-thickness rotator cuff tear.  However, the presence of artifacts related to metal fragments from the previous surgery made it difficult to exclude a very small tear.  (Tr. at 278-79, 304-05.)

On May 26, 2009, plaintiff saw Dr. Jeffrey Bentson for evaluation and management of right shoulder pain on the request of Dr. Bradshaw.  Plaintiff reported that he had gotten worse since the surgery.  He indicated that his condition improved slightly with physical therapy, but the pain recurred after several weeks.  (Tr. at 312.)  On exam, plaintiff had moderate tenderness in the acromioclavicular joint, no swelling or crepitation, mildly reduced

range of motion, and positive impingement sign. (Tr. at 312-13.) Dr. Benston assessed pain in the shoulder joint, recommending activity modification. (Tr. at 313-14.) They also discussed resuming physical therapy, repeating injections, or decompression. Plaintiff was to continue current medications, and Dr. Bentson would discuss chronic pain medications with Dr. Bradshaw. (Tr. at 314.)

On June 18, 2009, plaintiff followed up with Dr. Bradshaw, requesting pain pills and possibly a pain patch. Dr. Bradshaw explained that with treatment for chronic pain they were not going to be able to get plaintiff completely pain free but were trying to improve his ability to be functional with the pain medications and help bring the pain down to a significant extent. They also talked about the side effects of narcotics, including constipation, drowsiness, fatigue, and the addictive nature of the medications. Dr. Bradshaw reviewed the note from Dr. Benston, which did not set forth a clear plan. Plaintiff did not want another surgery. He reported having injections in the past, and they only worked for a little while so he was probably not going to proceed with those either. For pain, Dr. Bradshaw tried the patch. (Tr. at 347, 354.)

On November 2, 2009, plaintiff returned Dr. Bradshaw, reporting that he did great for awhile on the Duragesic 12 pain patch, but that wore off so they increased to 25. That also did great for awhile but now was not working as well either. Plaintiff had called the office because he overdid it and wanted some short-term medications, which Dr. Bradshaw provided. When he called for more, Dr. Bradshaw scheduled an office visit. Dr. Bradshaw increased the Duragesic to 50, but stated: "He does understand we are not trying to completely eliminate the pain but just make him more functional and he has really lost function because of the pain lately." (Tr. at 346, 353.)

On November 30, 2009, plaintiff saw Dr. Bentson, reporting sleep problems, difficulty breathing, constipation, joint pain, and numbness. He was taking Percocet three times per day. (Tr. at 310.)

On March 30, 2010, plaintiff returned to Dr. Bradshaw, using more pain medication because it was not working. He had signed a medication contract indicating the pills would not be refilled early, and Dr. Bradshaw warned him about that. If plaintiff violated the contract again, Dr. Bradshaw would no longer provide pain medications. There was some question about him going to a pain clinic, but plaintiff had no insurance, and a pain clinic would be unlikely to see him without any insurance. Dr. Bradshaw reset plaintiff's medication due date and changed him to 20 mg three times a day; he was not to take more than that. (Tr. at 345, 352, 374.)

On December 9, 2010, plaintiff followed up with Dr. Bradshaw, seeking a referral to a pain clinic. He reported that he attempted to return to work but could not handle the lifting. He also reported that the pain medications were not doing anything at the time. His mood was becoming an issue as well. Dr. Bradshaw adjusted medication, going up from MS-Contin (morphine) 30 to 60 mg three times per day. He also referred plaintiff to the Mercy pain clinic. (Tr. at 344, 351, 373.)

On December 14, 2010, plaintiff saw Dr. Nathan Meloy at the pain clinic for evaluation of his chronic right shoulder pain. He was on Morphine 60 mg three times per day and still rated his pain 7/10. He reported an interest in applying for disability, indicating that he recently attempted a job as a parts inspector but was unable to perform his duties because of pain and had to quit. He had received a second opinion from an orthopedic surgeon, who felt there was no further surgical pathology. He had injections in the past, which provided relief for about one month. He had not done any recent course of physical therapy. (Tr. at

319.) On exam, deep tendon reflexes were 2+ in the bilateral upper extremities, cervical range of motion was full in all planes, shoulder range of motion was full in all planes with increased pain on resistance to abduction and adduction, and there was tenderness to palpation over the long head of the biceps and over the acromion area. Muscle strength was 5/5. Dr. Meloy's impression was chronic right shoulder pain of unknown etiology, status post work-related injury with surgery in June 2008, and physical exam findings for some biceps tendinitis, as well as subacromial bursitis. Dr. Meloy suggested injections, chiropractic treatment, or another course of physical therapy, but plaintiff was not interested in any of these modalities. Dr. Meloy told plaintiff he did not see any indication for plaintiff to be on morphine three times daily and recommended he come off these medications. Dr. Meloy noted that it is fairly typical for a 50% dose increase every year to maintain the same level of pain. He further indicated that the medication was failing to provide pain relief if plaintiff's pain was still 7/10 after taking it, but plaintiff was adamant that he needed this medication to function. Dr. Meloy referred him to an occupational medicine specialist for further evaluation and treatment. Based on issues of depression related to pain, Dr. Meloy also wanted him to be evaluated for entry into the chronic pain program. (Tr. at 320.)

On January 24, 2011, plaintiff underwent an evaluation with Dr. Christopher Westra regarding the work-related injury. Dr. Westra noted that over the course of late 2008 until the present plaintiff had been on escalating doses of narcotics beginning with Percocet, proceeding to Duragesic, OxyContin, and more recently MS-Contin, prescribed by his primary care physician, Dr. Bradshaw. Plaintiff complained of pain in his right shoulder, which had not resolved or improved. He had physical therapy after the surgery and cortisone injections into his right shoulder. He reported depressed mood and appeared uncertain regarding his future goals. (Tr. at 331.) He reported doing no exercise or weight training with his right arm

or shoulder.  He complained of fatigue and weakness, ringing in his ears, dizziness, shortness of breath, change in appetite and bowel habits, joint and muscle pain, memory problems, numbness and tingling.  He also reported problems with depression, anxiety, and difficulty sleeping.  (Tr. at 332.)  On exam, his neck demonstrated relatively full range of motion.  On musculoskeletal exam, he exhibited adequate muscle bulk for a man his age and size.  On specific exam of his right shoulder, there was no gross atrophy or lack of muscle bulk in visual comparison with the left.  There was no atrophy or lack of muscle bulk in comparison of the lower arms bilaterally.  He was able to forward flex his arm to a full overhead reach and abduct his arms to a full overhead reach.  The movement of his right shoulder was smooth and fluent.  On testing of the rotator cuff muscles, there was some globally decreased strength particularly with internal and external rotation. There was also some minor weakness of the deltoid with strength testing.  Plaintiff displayed some accentuated pain behavior with grimacing, and he gave a token exertional effort.  Dr. Westra assessed right shoulder pain following acromioplasty.  (Tr. at 333.)  Plaintiff had been given a 5% disability rating for workers' compensation purposes and continued to have pain without significant anatomical derangement.  Psychosocial issues were present and significant in his delayed recovery.  Dr. Westra suggested a workers' rehabilitation program, including physical and occupational therapy with weight training.  Plaintiff expressed reluctance at this.  Dr. Westra also expressed that plaintiff was on too much narcotic medication and that this level was not going to be helpful over the long-term.  (Tr. at 334.)

On March 4, 2011, plaintiff returned to Dr. Bradshaw.  Plaintiff had called at the end of January reporting depression, and Dr. Bradshaw started him on Fluoxetine, an anti-

depressant.[1]  At the March 4 visit, plaintiff reported some improvement.  He also reported that his pain was a little better; some days, he was taking two MS-Contin rather than three.  Dr. Bradshaw increased the Fluoxetine dose to see if they could obtain more improvement.  Dr. Bradshaw also provided a refill of MS-Contin.  (Tr. at 343, 350, 372.)

On August 19, 2011, plaintiff followed up with Dr. Bradshaw for discussion of his medications and requesting a refill of Morphine.  Plaintiff reported feeling pretty good.  He also discussed his disability application.  Dr. Bradshaw believed plaintiff should go through the orthopedic surgeon to evaluate disability based on the shoulder; Dr. Bradshaw did not feel comfortable making that call.  Dr. Bradshaw wrote a new prescription for MS-Contin 60 mg three times per day and refilled Fluoxetine.  (Tr. at 360, 371.)

On October 2, 2012, plaintiff saw Dr. Bradshaw for medication check.  He had been taking MS-Contin 60 mg three times per day.  He had also been taking Tylenol but was not sure it was working.  He had been on Fluoxetine but was not taking it regularly.  Plaintiff also indicated that he had been to a pain clinic.  They wanted to do a full functional assessment on him but wanted him off his pain medication.  He asked what he could do when off his pain medications, and they did not say so he never completed the assessment.  Plaintiff and Dr. Bradshaw discussed pain medications, with Dr. Bradshaw indicating a high dose could actually result in more pain.  Dr. Bradshaw suspected the mood issues were related to pain, but if plaintiff was going to use Fluoxetine he had to take it regularly to get the benefit.  Dr. Bradshaw refilled MS-Contine and Fluoxetine, and for break-through pain provided

---

[1]http://www.drugs.com/fluoxetine.html.

Naprosyn.[2] (Tr. at 392.)  In March 2013, plaintiff tested positive for marijuana, and Dr. Bradshaw declined to refill pain medications any longer.  (Tr. at 393.)

**B.    Procedural History**

   **1.    Plaintiff's Application and Supporting Materials**

In May 2011, plaintiff applied for social security benefits, alleging a disability onset date of March 20, 2009.  (Tr. at 162.)  In his disability report, plaintiff indicated that he could not work due to chronic right shoulder and arm pain, and depression.  (Tr. at 187.)  He indicated that he had been laid off in March 2009 because he could no longer do the work.  He attempted a return to work in December 2010 but was unable to do it because of chronic pain and medication side effects (fatigue, dizziness, memory issues), lasting only two days on the new job.  (Tr. at 188.)  He reported past work (Tr. at 189) as an industrial maintenance mechanic from August 1994 to July 2002, which required him to lift up to 100 pounds or more, 50 pounds frequently (Tr. at 200); as a machine operator/laser set up from April 2004 to November 2004, which required him to lift up to 100 pounds or more, 25 pounds frequently (Tr. at 203); as a maintenance mechanic/laborer from January 2005 to March 2009, which required him to lift 100 pounds or more, 25 pounds frequently (Tr. at 199); and as a quality assurance inspector in December 2010, the job he held for just two days (Tr. at 188, 196).

In a function report, plaintiff related constant pain in his right shoulder and arm. Medications helped curb the pain a little but not totally.  He reported that the medications affected his mental capacity, causing sleepiness, confusion, visual impairment, and dizziness. (Tr. at 207.)  He indicated that he did chores around the house but with rest breaks; he usually rested more than he worked.  He wrote that he mostly slept in a recliner, and that

---

[2]Naprosyn is a non-steroidal anti-inflammatory drug used to treat pain or inflammation. http://www.drugs.com/naprosyn.html.

personal care tasks hurt his shoulder. (Tr. at 208.) He prepared simple meals – sandwiches, eggs, frozen dinners – once per day. He also did some light laundry, snow shoveling, and light house cleaning. He received help with snow shoveling, lawn mowing, laundry, and cooking. (Tr. at 209.) He was able to go out and drive a car, but his wife drove most of the time. He preferred to have someone come with him because he became disoriented. His wife did most of the shopping. (Tr. at 210.) He spent his time watching TV; he no longer played sports, hunted, or swam, and rarely went out. (Tr. at 211.) He indicated that his conditions affected his ability to lift, stand, reach, talk, see, remember, complete tasks, concentrate, understand, follow instructions, and use his hands. He stated that he did not want to lift anything, no matter how light, and his medications affected his understanding, vision, memory, concentration, and ability to complete tasks. He indicated that he could walk one mile before he had to stop and rest. He could pay attention for "a short while." (Tr. at 212.) He followed spoken instructions "pretty well" but preferred to have things written down. (Tr. at 212.) He got along with authority figures pretty well but did not handle stress well; constant pain was nerve racking. He handled changes in routine pretty well. (Tr. at 213.) He reported taking Morphine, which made him sleepy and confused, and Fluoxetine, which caused constipation, nightmares, and loss of appetite. He concluded that his injury had ruined his life. Once a physically active person, he now sat and watched TV. The medication never took all the pain away, and extra physical tasks aggravated his condition. (Tr. at 214.)

In a physical activities addendum, plaintiff indicated that he mostly slept in a recliner, as laying in bed hurt his shoulder. He indicated that in a day he could sit seven hours, and stand and walk for two hours. (Tr. at 215.)

In a later disability report completed in September 2011, plaintiff indicated that his shoulder was progressively getting worse. Any movement caused pain. His depression had

also worsened. (Tr. at 218.) He indicated that he could care for himself but not without difficulty. Reaching to towel himself after a shower was painful, as was reaching above his head to put on a shirt. Because of increased depression, he moped around. He no longer mowed the lawn, shoveled snow, or enjoyed sports. He did not cook as often, as it was difficult to do even simple tasks such as chopping vegetables. (Tr. at 221.) He also reported suffering from dry mouth, ringing in the ears, nightmares, anxiety, mild hallucinations, memory loss, and loss of self-worth. (Tr. at 222.)

In a November 2011 function report, plaintiff complained of constant pain in his right shoulder and arm. He also reported weakness in these areas. Any physical exertion aggravated his pain. His medications helped a little but affected his mental capabilities. (Tr. at 225.) He reported having no bed time but rather took naps day and night. Pain impacted his personal care. (Tr. at 226.) He reported that his conditions affected all of the abilities listed on the form – lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. at 230.)

In a March 2012 disability report, plaintiff again indicated that his right shoulder and arm pain had worsened, and it seemed as if the pain medication was no longer working. His depression had also worsened. (Tr. at 239.) He reported taking Fluoxetine for depression, Morphine for chronic pain, and Tylenol for breakthrough pain. (Tr. at 241.) Because of chronic pain, he reported doing less and less each day, particularly household chores. (Tr. at 242.)

### 2. Agency Review

On August 25, 2011, Alexander Stolarski, Ph.D. conducted a psychological evaluation set up by the agency. (Tr. at 376.) Plaintiff described his injury and treatment, including his

current prescription of Morphine Sulfate 60 mg three times per day. (Tr. at 376-77.) Dr. Stolarski opined that plaintiff may be addicted to his Morphine medication, and that there was evidence that this medication may have an impact on his cognition. Several times during the interview, plaintiff said that his mind/memory was not what it should be. (Tr. at 377.)

Dr. Stolarski found plaintiff cooperative, but there was not enough information for him to determine if plaintiff was malingering. Dr. Stolarski did have the clinical impression that plaintiff seemed quite comfortable not working, simply sitting back in his recliner and watching TV most of the day. Plaintiff described his mood as "lousy," but Dr. Stolarski found his affect appropriate and his mood normal. He smiled, was bright and cheery during the interview, and Dr. Stolarski saw no evidence of anxiety or depression. Plaintiff endorsed sleep disturbance, low energy, and suicidal thoughts with no plan. He also reported a sense of worthlessness and guilt because he was not being productive. Evaluation of thought content revealed no evidence of delusions, hallucinations, or paranoid ideation. Remote and recent memory were within normal limits, but immediate memory evidenced a mild to moderate impairment. Regarding concentration, he was able to spell the word "world" backward and forward. He was able to follow a three-step command and had no problem following conversation. Deficits were evidenced in abstract thinking, but Dr. Stolarski indicated that this was not uncommon with those of plaintiff's educational level. Insight was reasonable, and judgment capabilities maintained. (Tr. at 378.)

Regarding activities of daily living, plaintiff indicated that he awoke at 6:00 a.m., helped his wife get ready for work, then went back to bed or to his chair to sleep until 8:00 a.m. He then had some breakfast, washed, shaved, and did some chores around the house. He stated that most of the day he "lives in his chair." (Tr. at 379.) Dr. Stolarski's impression was

that plaintiff was not motivated and seemed content with his way of life.  His social functioning was basically limited to immediate family.  (Tr. at 379.)

Regarding concentration, plaintiff could read magazines or the newspaper but did not read books.  He reported that if he puts his mind to it, he can get things done, and if he starts something he can finish it.  Dr. Stolarski saw no evidence of problems with concentration and pace.  Plaintiff was able to dress, wash, and tend to his personal care, and he did laundry for himself and the family.  (Tr. at 379.)  Regarding his work history, Dr. Stolarski opined that plaintiff had never been very invested in his work and seemed to adapt well to a status of unemployment and being non-productive.  He never had any accommodations in his work process.  (Tr. at 379.)

Dr. Stolaski diagnosed no mental impairment, setting a GAF score of 75.[3]  He listed plaintiff's prognosis as guarded, noting that a pain clinic wanted to work with plaintiff but wanted him to taper off the morphine.  Plaintiff refused, claiming he would not be able to lift weights to strengthen his shoulder.  When he sought a second opinion post-surgery, the doctor would not perform any further surgery or prescribe medication.  Plaintiff returned to his family physician, Dr. Bradshaw, who continued to renew morphine.  Dr. Stolarski concluded that plaintiff was able to understand, remember, and carry out simple instructions; respond appropriately to supervisors and co-workers; maintain concentration, attention, and work pace; withstand routine work stressors; and adapt to change.  (Tr. at 380.)

---

[3]"GAF" stands for "Global Assessment of Functioning."  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others.  Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, and 61-70 "mild" symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).  The Fifth Edition of the DSM, published in 2013, abandoned the GAF scale.  See Williams v. Colvin, 757 F.3d 610, 613 (7th Cir. 2014).

The agency also arranged for several consultants to review the record. On August 29, 2011, based on review of the medical evidence and Dr. Stolarski's report, Susan Donahoo, Psy.D., found no evidence of a severe mental impairment. (Tr. at 76.) On August 30, 2011, Janis Byrd, M.D., concluded that plaintiff could perform medium work, with occasional overhead reaching with the right arm. (Tr. at 77-78.) On December 12, 2011, Kyla King, Psy.D., reviewed the evidence and affirmed the August 29, 2011 mental assessment as written. (Tr. at 386.) On December 13, 2011, Syd Foster, D.O., reviewed the evidence and affirmed the August 30, 2011 physical assessment as written. (Tr. at 387.)

The SSA denied plaintiff's application initially (Tr. at 70, 85) and on reconsideration (Tr. at 80, 94.) Plaintiff then requested a hearing before an ALJ. (Tr. at 103.)

### 3. Hearing

On June 6, 2013, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a vocational expert ("VE"). (Tr. at 25.)

### a. Plaintiff's Testimony

Plaintiff testified that he was 57 years old, 5'10" tall, and 208 pounds. (Tr. at 30-31.) He indicated that he had a driver's license and drove on average twice per week. (Tr. at 32.) He had a 12th grade education with no further vocational training. He indicated that since the alleged onset date of March 20, 2009, he worked for two days before quitting due to his condition. (Tr. at 33.) He identified past work as an industrial maintenance mechanic from 1994-2002, which required lifting up to 40 pounds. (Tr. at 33-34.) After that, he worked as a machine operator/laser setup operator for about a year, which required lifting up to 20 pounds.[4] (Tr. at 34-35.) From 2005 to 2009, he worked as a maintenance mechanic and

_____

[4]On questioning from counsel, plaintiff indicated he did this job for about five months from June 2004 to November 2004. (Tr. at 49.)

laborer, which required lifting up to 70 pounds. (Tr. at 35-36.) For a brief time in 2010 (two days), he worked as a quality assurance inspector, which involved lifting up to 25 pounds; plaintiff testified that he could not do this job because of the lifting and his pain. (Tr. at 36.)

The ALJ asked plaintiff to identify the primary reason he could not work, and plaintiff responded pain in his right shoulder, for which he took Morphine Sulfate. He indicated that he had been on opiates since his surgery about seven years ago. He reported side effects of nausea, dizziness, sleepiness, loss of mental focus, and constipation. (Tr. at 37.) Plaintiff indicated that he raised the issue with his doctor and asked for a stronger medication, but the doctor declined to provide one. (Tr. at 38.) In March 2013, plaintiff tested positive for marijuana, and his doctor refused to provide any further medications based on the violation of their contract. (Tr. at 39.)

Plaintiff testified that his shoulder pain was constant, aggravated at times. The pain was primarily in his shoulder but at times ran into his biceps. (Tr. at 40.) Activities such as shoveling snow, mowing the lawn, and picking up items in the house aggravated the pain. To relieve the pain, he had tried many things, including marijuana and over-the-counter medications. He completed physical therapy after the surgery, which helped at first, but then the pain got worse. (Tr. at 41.) He testified that his condition improved for awhile after his 2008 surgery, but as time went on the pain returned, gradually worsening. (Tr. at 42.)

The ALJ turned to plaintiff's depression complaints, noting that the examining psychologist gave plaintiff a GAF of 75, indicative of no severe mental impairment. Plaintiff testified that he felt like he had a severe depression problem, and that he did not consider the psychologist very professional. Plaintiff indicated that he did not have a treating psychiatrist or psychologist; Dr. Bradshaw provided medication for depression, but it did not help. Dr. Bradshaw had not tried another anti-depressant medication, and plaintiff did not "consider him

to be much of a doctor either." (Tr. at 42.) Plaintiff asserted deterioration in memory as a result of depression. His depression also possibly affected his ability to focus and concentrate. He testified that he did not go out much but got along okay with his family. (Tr. at 43-44.)

Plaintiff testified that he slept poorly. He mostly slept in a recliner because laying in bed for more than two hours made his shoulder worse. (Tr. at 44.) He slept about five hours total and felt tired the next day, having to take naps or falling asleep in his chair without knowing it. (Tr. at 44-45.)

Plaintiff stated that he could manage self care fairly well. (Tr. at 45.) He did some household chores, but reported that pushing a vacuum cleaner aggravated his shoulder. (Tr. at 45-46.) He did laundry but pushed the basket down the stairs. He also took out the trash. He did some snow shoveling and grass mowing but asked for help from his children.[5] His wife usually did the shopping. (Tr. at 46.) He denied going fishing or hunting since his surgery. (Tr. at 46-47.) He also denied exercise (aside from activities around the house) or any hobbies. (Tr. at 47-48.) For fun, he watched TV. (Tr. at 48.)

b.    VE's Testimony

The VE first classified the skill and exertion levels of plaintiff's past jobs: industrial maintenance mechanic (medium, skilled work as performed; heavy work, SVP 7, generally)[6];

---

[5]On questioning from counsel, plaintiff testified that he spent about ½ hour per day on chores. He spread them out over the week, e.g., dishes one day, laundry the next, mowing lawn the day after that. (Tr. at 51.)

[6]SVP stands for "Specific Vocational Preparation" and represents the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. https://www.onetonline.org/help/online/svp. Unskilled work corresponds to an SVP of 1-2, semi-skilled work corresponds to an SVP of 3-4, and skilled work corresponds to an SVP of 5-9 in the Dictionary of Occupation Titles ("DOT"). SSR 00-04p, 2000 SSR LEXIS 8, at *8.

machine operator/laser setup operator (medium, semi-skilled work as performed; light work, SVP 4, generally);[7] and maintenance mechanic laborer (heavy, skilled work as performed; heavy, SVP 7, generally). (Tr. at 55-57.) The ALJ then asked a hypothetical question assuming a person of plaintiff's age, education, and work experience, capable of medium work with occasional reaching overhead with the right upper extremity. The VE testified that such a person could do plaintiff's past work as a laser setup machine operator. Changing the exertional level to light, the answer was the same. (Tr. at 57.) The VE also identified other jobs the person could do at the medium level, including metal plastics worker, packaging machine operator, and carpenter. (Tr. at 58.) If the person would be off task one to two hours per day due to pain and fatigue, all work would be precluded. (Tr. at 59.)[8]

### 4. ALJ's Decision

On July 10, 2013, the ALJ issued an unfavorable decision. (Tr. at 9.) Following the familiar five-step sequential evaluation process,[9] the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since March 20, 2009, the alleged onset date.

_____

[7]On cross-examination, the VE admitted that the DOT code he used for this position was not a great fit, as the DOT was out of date. (Tr. at 60-61.) On further questioning by the ALJ, the VE testified that in his experience this position was generally performed at the light level. (Tr. at 65-66.)

[8]In a closing statement, plaintiff's counsel asked to amend the onset date to the day before plaintiff's 55th birthday. (Tr. at 64-65.) With a light RFC and a finding that he could not perform his past work, plaintiff would be disabled as of his 55th birthday under SSA regulations. See 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.06; see also 20 C.F.R. § 404.1568(d).

[9]Under this process, the ALJ determines (1) whether the claimant is currently working, i.e., engaging in "substantial gainful activity"; (2) if not, whether he suffers from a severe impairment or impairments; (3) if so, whether any of those impairments are conclusively disabling under the agency's Listings; (4) if not, whether the claimant retains the RFC to perform his past relevant work; and (5) if not, whether he can make the adjustment to other work in the economy. See 20 C.F.R. § 404.1520(a)(4).

While plaintiff did work after that date, it did not rise to the level of substantial gainful activity. (Tr. at 14.)

At step two, the ALJ determined that plaintiff suffered from the severe impairment of right shoulder disorder status post acromioplasty and distal clavicle excision with residual pain. The ALJ found plaintiff's obesity non-severe. The ALJ considered the potential impact of obesity in causing or contributing to co-existing impairments but found no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, cardiac, or any other system's functioning, as objective examination was unremarkable. (Tr. at 14.) The ALJ also found plaintiff's depression non-severe, noting that plaintiff never saw a mental health professional prior to the consultative psychological exam in August 2011. (Tr. at 14-15.) At that exam, he appeared cooperative with appropriate affect, as well as normal speech, judgment, and recent and remote memory, good concentration, and no evidence of delusions, hallucinations, or paranoia. Dr. Stolarski rated plaintiff's global assessment of functioning at 75, indicating no more than slight impairment. (Tr. at 15.)

The ALJ also considered the four broad functional areas set out in the regulations for evaluating mental disorders.[10] The ALJ found no limitation in activities of daily living, as plaintiff reported being capable of managing his personal care, washing laundry and dishes, watching television and movies, mowing the lawn, managing money, shopping, preparing meals, shoveling snow, and driving. The ALJ found mild limitation of social functioning, as

_____

[10]These four broad areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme; and the degree of limitation in the fourth area using a four-point scale: none, one or two, three, and four or more. Id. If the ALJ rates the degree of limitation in the first three areas as "none" or "mild" and "none" in the fourth area, he may generally conclude that the impairment is not severe. Id. § 404.1520a(d)(1).

plaintiff indicated that he socially isolates but admitted that he has no problem getting along with family, friends, neighbors, or authority figures; he also related going to picnics with friends, and he appeared to have no difficulties interacting at the hearing. The ALJ also found mild limitations in concentration, persistence, and pace. Plaintiff endorsed memory problems and exhibited mild to moderate deficits in immediate memory during examination. Nevertheless, he was able to engage in multiple activities that require a significant amount of concentration, persistence, and pace, such as preparing meals, driving, shopping, handling money, watching movies, and performing house and yard work. He also conceded that he can finish what he starts and follow both written and verbal instructions. Additionally, he exhibited no problems with concentration or pace during the consultative exam and appeared to have no difficulties following along at the hearing. Finally, the ALJ found no episodes of decompensation. Because plaintiff's mental impairment caused no more than mild limitation, the ALJ deemed it non-severe. (Tr. at 15.)

The ALJ found that Dr. Stolarski's opinion supported this finding. Dr. Stolarski found that plaintiff remained capable of understanding, remembering, and carrying out simple instructions, responding appropriately to supervisors and coworkers, adapting to change, and withstanding routine work stressors. (Tr. at 15.) The ALJ found this opinion consistent with plaintiff never seeking treatment from a mental health specialist, his admitted high level of daily functioning, and the mostly unremarkable mental status evaluation. The ALJ thus gave Dr. Stolarski's opinion significant weight. (Tr. at 16.) The ALJ also gave great weight to the opinions of the state agency psychological consultants, Drs. King and Donahoo, who found plaintiff's depression non-severe. Their opinions were consistent with plaintiff's GAF of 75, his high level of daily functioning, the rather unremarkable objective mental evaluation findings, and his not seeking treatment from a mental health specialist. (Tr. at 16.)

At step three, the ALJ found that plaintiff's shoulder impairment did not meet a Listing. The ALJ specifically considered Listing 1.02, but found no evidence of inability to perform fine and gross movements effectively as defined in § 1.00B2c. (Tr. at 16.)

The ALJ next determined that plaintiff retained the RFC to perform medium work, except with no more than occasional reaching overhead with the right upper extremity. In making this finding, the ALJ considered the medical opinion evidence and plaintiff's alleged symptoms. (Tr. at 16.)

The ALJ first summarized plaintiff's claims, noting that plaintiff alleged disability due to chronic right shoulder and arm pain, as well as depression. Plaintiff asserted that these impairments limited his ability to lift, squat, bend, stand, reach, use his hands, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. At the hearing, plaintiff testified that he suffers from chronic right shoulder pain requiring him to use Morphine for the past several years, and that he continued to be depressed. (Tr. at 17.)

The ALJ noted that plaintiff injured his right shoulder at work in August 2006. Treating providers diagnosed chronic impingement of the right shoulder and degenerative joint disease of the acromioclavicular joint. After conservative treatment failed, plaintiff underwent surgery on his shoulder in June 2008. Following the surgery, plaintiff received physical therapy but continued to complain of ongoing pain. On exam, he displayed tenderness, positive impingement sign at times, some intermittent decreased strength, and occasional mild reduced range of motion. Diagnostic imaging showed a benign lesion, degenerative changes to the acromioclavicular joint with mild impingement, and some degenerative cysts. His primary care doctor prescribed an escalating level of narcotic pain medication since 2008, including Morphine three times per day. (Tr. at 17.)

Because of plaintiff's right shoulder impairment, as well as considering the reported side effects of medication, and plaintiff's non-severe impairments, the ALJ found plaintiff limited to medium work with no more than occasional overheard reaching with the right upper extremity. (Tr. at 17.) However, "after careful consideration of the evidence, [the ALJ found] that although [plaintiff's] medically determinable impairments could reasonably be expected to cause some of [sic] symptoms of the types alleged, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 17.)

In support, the ALJ first noted that the objective medical evidence failed to fully substantiate the allegations of disabling symptoms. Plaintiff had a well-healed incision, full range of motion, intact neurovascular findings, negative impingement testing, and no erythema, effusion, or edema 22 weeks after his June 2008 surgery. Similarly, he evidenced intact motor and sensory findings with only mildly reduced range of motion and no weakness, swelling, crepitus, or instability during a May 2009 exam. Additionally, he displayed intact sensation, full strength, and normal range of motion, with no radicular symptoms or muscle weakness during an exam in December 2010. (Tr. at 17.) Likewise, he exhibited adequate muscle bulk, negative testing, and no joint deformity or atrophy during a January 2011 exam. He reported feeling "pretty good" in August 2011 and sought minimal treatment other than medication maintenance after that. (Tr. at 18.)

In addition to the rather unremarkable objective examination findings, the ALJ found that plaintiff's non-compliance with and lack of motivation to try treatment undermined his allegations of disabling symptoms. The ALJ noted that plaintiff consistently refused to lower his narcotic pain medication, despite multiple providers suggesting he do so and being

informed that too much pain medication can actually increase his pain level.[11]  He also declined further physical therapy and chose not to proceed with biceps injections.  The ALJ concluded that this refusal suggested that plaintiff's pain was more manageable than he alleged, as one would expect him to try any or all of these treatment modalities if he really were in constant severe pain.  Plaintiff had also missed doses, taken too much medication, and smoked marijuana, which ultimately led to him no longer receiving prescribed narcotic pain medication as of March 2013.  (Tr. at 18.)

Further, the ALJ found that plaintiff's receipt of unemployment compensation during the same period he alleged disability undermined his credibility, as he asserted both that he was able and available for work to collect unemployment and that he could not perform work at even the substantial gainful activity level for his disability allegations, "inherently inconsistent claims."  (Tr. at 18.)  Similarly, plaintiff's allegations that his impairments affected his abilities to squat, bend, stand, use his hands, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, understand, and follow instructions were not consistent with examination findings or his admitted activities of daily living, which suggested a high level of daily functioning.  (Tr. at 18.)

As for the opinion evidence, the ALJ gave great weight to the opinions of the state agency medical consultants, Drs. Foster and Bird, who found plaintiff capable of medium work with no more than occasional overhead reaching with the right arm.  The ALJ found these opinions consistent with objective findings during multiple exams, plaintiff's daily activities, and plaintiff's certification that he was able to work to collect unemployment.  The ALJ gave little

---

[11]The ALJ noted that addiction to pain medication was suspected during the consultative psychological exam, which suggested a secondary gain from plaintiff's ongoing severe pain allegations.  (Tr. at 18 n.1.)

weight to the fact that plaintiff received a 5% permanent partial disability rating due to his right shoulder injury, as the SSA does not acknowledge partial disability under its rules.  (Tr. at 18.)

At step four, the ALJ found that plaintiff remained able to perform his past work as a machine operator.  The ALJ found that plaintiff performed this work within the past 15 years, did it long enough to learn it, and earned a sufficient amount at it.  The VE testified that a person with plaintiff's RFC could perform this job, both as plaintiff actually performed it (at the medium level) and as it is generally done (at the light level).  Based on the VE's testimony that a person like plaintiff could also work as a carpenter, packaging machine operator, and metal plastics worker, the ALJ alternatively denied the claim at step five.  (Tr. at 19.)

### 5.    Appeals Council Review

Plaintiff requested review by the Appeals Council, submitting additional medical evidence in support of the request.  (Tr. at 245, 397-403.)  On June 25, 2013, plaintiff saw Dr. Chandur Piryani at Spine Pain Diagnostics Associates regarding right-sided neck and right shoulder and arm pain.  Plaintiff had been taking Morphine Sulfate but after the positive drug test his doctor stopped prescribing it, and he had been off medications since then.  His pain had been affecting his daily activities of life.  (Tr. at 400.)  On exam, he had tenderness in the mid to lower cervical area on the right side and in the right anterior shoulder.  He had limited range of motion of the right shoulder, with pain.  (Tr. at 402.)  He also had some pain going down the right arm and diminished reflexes in the biceps and brachioradials.  Dr. Piryani ordered a cervical MRI and an EMG of the right upper extremity and prescribed a trial of

Gabapentin,[12] as well as Zanaflex,[13] Lidoderm cream,[14] and Elavil.[15] Plaintiff was advised to maintain normal activities, advised against bed rest, and told to follow up after imaging studies for further recommendations. (Tr. at 403.)

A July 25, 2013, cervical MRI revealed relatively mild disc bulging at C3-4, C4-5, and C5-6 with mild impingement on the spinal cord. The spinal canal was relatively narrow at all three of those levels, contributing significantly to the fact that such mild bulging impinged the cord. The MRI showed no evidence of herniated disc or significant active bone lesion. (Tr. at 397.)

On August 8, 2013, plaintiff returned to Dr. Piryani, reporting that the Gabapentin helped but the Lidoderm did not. Dr. Piryani reviewed the MRI, summarized above, as well as the EMG, which showed chronic right cervical radiculopathy at the C5-6 level and mild right median neuropathy at the carpal tunnel segment. (Tr. at 398.) Dr. Piryani assessed persistent right shoulder pain after work-related injury requiring acromioplasty, with some pain in the right side of the neck, right trapezius, and right upper arm with MRI evidence of degenerative changes and disc bulging and EMG evidence of right C5-6 radiculopathy probably neck related. He planned a cervical facet joint nerve block and continued Gabapentin, Zanaflex, and Elavil. (Tr. at 399.)

In his brief supporting Appeal Council review, plaintiff argued that the evidence did not support the ALJ's medium RFC, and that the ALJ's credibility determination was not

---

[12]Gabapentin is used to treat nerve pain. http://www.drugs.com/gabapentin.html.

[13]Zanaflex is a short-acting muscle relaxer. http://www.drugs.com/zanaflex.html.

[14]Lidoderm cream is a local anesthetic used to relieve pain. http://www.drugs.com/lidoderm.htm.

[15]Elavil is an anti-depressant. http://www.drugs.com/elavil.htm.

supported by substantial evidence.  He further argued that the newly submitted evidence, including the cervical MRI documenting disc bulging at C3-4, C4-5, and C5-6 with impingement on the spinal cord, and the EMG showing cervical radiculopathy, suggested that he could not perform the lifting required of medium work. (Tr. at 245-46.)

On August 22, 2014, the Appeals Council denied plaintiff's request for review. Specifically, the Council stated:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.  We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence.
>
> We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. at 1-2.)

## II.  STANDARD OF REVIEW

Ordinarily, when the Appeals Council denies review, the court reviews the ALJ's decision as the final decision of the Commissioner.  See, e.g., Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015).  In limited circumstances, however, the court may review the Council's decision to deny review.  By regulation, the Council is supposed to review a case if the claimant submits "new and material evidence" that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision contrary to the weight of the evidence in the record.  Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008) (citing 20 C.F.R. 404.970)b)).  The court evaluates de novo whether the Council made an error of law in applying the regulation; absent legal error, however, the Council's discretionary decision whether to review is unreviewable.  Id.

The court reviews the ALJ's decision to determine whether it is supported by "substantial evidence" and free of harmful legal error.  E.g., Hopgood v. Astrue, 578 F.3d 696,

698 (7th Cir. 2009). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Minnick, 775 F.3d at 935. Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the ALJ's; if reasonable people can differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). In rendering his decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of evidence and testimony in the record. Id.

### III. DISCUSSION

As indicated, in this court plaintiff argues that (A) the ALJ failed to properly evaluate his credibility; (B) the ALJ's RFC determination lacks substantial evidentiary support; and (C) the Appeals Council erred in failing to grant review based on the additional evidence he submitted. I address each argument in turn.

### A.     Credibility

In evaluating a claimant's credibility, the ALJ first determines whether the claimant suffers from medically determinable impairments that could reasonably be expected to produce the pain or other symptoms he alleged. If not, the alleged symptoms cannot be found to affect his ability to work. If so, the ALJ must then evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. At this step, the ALJ may not discredit the claimant's testimony about his pain and limitations solely because there is no objective medical evidence supporting it. E.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). Rather, once the claimant produces medical evidence of an underlying impairment, the ALJ must evaluate the claimant's statements based on the entire record, SSR 96-7p,

1996 SSR LEXIS 4, at *6, providing specific reasons for the credibility determination, supported by the evidence in the case record. Id. at *12. So long as the ALJ gives specific reasons supported by the record, the reviewing court will not overturn his credibility determination unless it is "patently wrong." Curvin v. Colvin, 778 F.3d 645, 651 (7th Cir. 2015).

In the present case, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause some of the symptoms alleged, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[16] (Tr. at 17.) In support, the ALJ found that (1) the objective medical evidence failed to fully substantiate plaintiff's allegations of disabling symptoms; (2) plaintiff's non-compliance with and lack of motivation to try treatment undermined his allegations of disabling symptoms; (3) plaintiff's receipt of unemployment compensation, which required him to certify that he was able and available for work, was inconsistent with his application for disability benefits; and (4) plaintiff's allegation that his impairments affected virtually all of his abilities conflicted with examination findings and his admitted activities of daily living. (Tr. at 18.) Plaintiff attacks each of these findings.

## 1. Objective Medical Evidence

Plaintiff first accuses the ALJ of cherry picking normal exam findings from the record, leaving out the abnormal findings. See, e.g., Bates v. Colvin, 736 F.3d 1093, 1099 (7th Cir. 2013) (stating that the ALJ cannot rely only on evidence supporting his decision). Plaintiff

---

[16]Plaintiff faults the ALJ for using this boilerplate phrase. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 ("The statement by a trier of fact that a witness's testimony is 'not entirely credible' yields no clue to what weight the trier of fact gave the testimony.") (internal quote marks omitted). However, use of such boilerplate may be harmless where, as here, the ALJ goes on to provide specific reasons for his finding. See, e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

points to post-surgical records documenting positive impingement sign, pain in the biceps tendon, loss of motion and weakness, tenderness in the AC joint, limited range of motion, tenderness to palpation, and decreased strength. (Pl.'s Br. [R. 10] at 11-12.) However, the ALJ is not required to mention every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence supporting disability. See, e.g., Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). Moreover, the ALJ did discuss much of this evidence, noting that after conservative treatment failed, plaintiff underwent surgery; that plaintiff continued to complain of pain after the surgery and physical therapy; and that on examination he displayed tenderness to palpation, positive impingement sign at times, some intermittent decreased strength, and occasional mildly reduced range of motion. (Tr. at 17.) The ALJ also discussed the diagnostic imaging showing degenerative changes to the acromioclavicular joint with mild impingement. (Tr. at 17.) Finally, the ALJ noted that plaintiff's primary care doctor treated plaintiff's reported pain with an escalating level of narcotic pain medication.[17] (Tr. at 17.)

In finding that the record failed to fully substantiate plaintiff's claims of disabling symptoms, the ALJ cited evidence from the longitudinal record undercutting plaintiff's claims. In December 2008, 22 weeks after his surgery, plaintiff displayed a well-healed incision, full range of motion, and no edema, erythema, or effusion. (Tr. at 17, 252.) During a May 2009 consult with Dr. Bentson, plaintiff showed mildly reduced range of motion and no swelling, crepitation, or instability. (Tr. at 17, 312-13.) During his December 2010 evaluation with Dr.

---

[17]In reply, plaintiff acknowledges that the ALJ cited this evidence earlier in his decision but argues that the ALJ relied only on cherry-picked evidence in support of his credibility determination. However, the court reads the ALJ's decision as a whole to ascertain whether he considered the relevant evidence. See, e.g., Curvin, 778 F.3d at 650. Here, the ALJ cited the evidence discussed in the text immediately prior to his conclusion that plaintiff's right shoulder impairment limited his ability to work and could cause some of the symptoms alleged. (Tr. at 17.)

Meloy, plaintiff displayed full range of motion and normal muscle strength. (Tr. at 17, 319-20.) During his January 2011 exam with Dr. Westra, he showed no atrophy or lack of muscle bulk, full overhead reach, negative testing, and minor weakness on strength testing. (Tr. at 18, 333.) Finally, in August 2011, plaintiff told Dr. Bradshaw he felt "pretty good" and received minimal treatment after that other than medication maintenance. (Tr. at 18, 360.) While a claimant's testimony may not be rejected based solely on lack of medical support, the ALJ may find the objective medical evidence a "useful indicator" in reaching a reasonable conclusion about the intensity and persistence of a claimant's symptoms. 20 C.F.R. § 404.1529(c)(2); see also Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009). The ALJ did not err by considering the objective medical evidence as one factor in his analysis here.

### 2. Failure to Follow Treatment Recommendations

Plaintiff next faults the ALJ for relying on his declination of physical therapy and injections in favor of continued heavy use of narcotic pain medication. Plaintiff contends that the ALJ played doctor by questioning his choice of treatment modalities. As the ALJ noted, however, several different physicians questioned plaintiff's use of narcotics and his refusal to consider other options. (Tr. at 320, 334, 380.) The ALJ did not reach this conclusion on his own.

Plaintiff notes that his primary doctor prescribed the narcotics; the alternative treatment suggestions came from one-time evaluators rather than treating physicians. But this does not mean that the ALJ was required to ignore the opinions of the non-treating physicians. Plaintiff also notes the ALJ's citation of 20 C.F.R. § 404.1530(a), which provides that a claimant must follow treatment prescribed by his treating physician if this treatment would restore the claimant's ability to work. However, the ALJ did not deny the claim pursuant to this

regulation.[18]  Rather, he considered plaintiff's refusal to try other options in evaluating his credibility.  See, e.g., Thao v. Astrue, No. 08-C-33, 2008 U.S. Dist. LEXIS 58775, at *22-24 (E.D. Wis. July 24, 2008) (distinguishing between violation of the non-compliance regulation and consideration of medical evidence in evaluating credibility).  The ALJ explained that plaintiff's refusal to try further therapy or proceed with injections suggested that his pain was more manageable than he alleged; the ALJ expected that plaintiff would try these other options if his pain were truly as severe and intractable as he claimed, despite high doses of narcotics.  The ALJ also cited the psychological consultant's opinion that plaintiff had become addicted to pain medication, which suggested a secondary gain from his ongoing severe pain allegations.  Finally, the ALJ noted that plaintiff failed to comply with the medication regimen prescribed by treating physician Dr. Bradshaw, missing doses, taking too much, and smoking marijuana, which ultimately lead to Dr. Bradshaw no longer prescribing narcotics.  (Tr. at 18.)

### 3.   Receipt of Unemployment

Plaintiff also faults the ALJ for deeming his receipt of unemployment benefits "inherently inconsistent" with his disability application.  Plaintiff cites a memo from Chief Administrative Law Judge Frank Cristaudo, which indicates that "it is SSA's position that individuals need not choose between applying for unemployment insurance and Social

---

[18]The regulation applies when an individual who would otherwise be found disabled fails without justifiable cause to follow treatment prescribed by a treating source that would restore the individual's ability to work.  In that situation, the person cannot by virtue of such "failure" be found to be under a disability.  SSR 82-59, 1982 SSR LEXIS 25, at *1-2.  Here, the ALJ did not find plaintiff disabled but for his failure to try the other treatment modalities suggested by the evaluators.  Thus, plaintiff's argument that there is no evidence that any other form of treatment would allow his return to work misses the mark.  Plaintiff also faults the ALJ for not asking about his failure to try other treatment before using it as a negative credibility factor.  The ALJ did ask plaintiff about treatment modalities, specifically covering plaintiff's belief that physical therapy did not help.  (Tr. at 41.)  The ALJ also asked plaintiff why he had "bounced around between a few physicians some of whom would not prescribe any narcotic pain medication."  (Tr. at 38.)

Security disability benefits." (R. 10 at 14.) Rather, "ALJs should look to the totality of the circumstances in determining the significance of the application for unemployment benefits and related efforts to obtain employment." (R. 10 at 14.) The Seventh Circuit has essentially taken the same position:

> The case law of this circuit clearly permits the ALJ to give some consideration to such activity on the part of the applicant when assessing his credibility. Schmidt v. Barnhart, 395 F. 3d 737, 746 (7th Cir. 2005). But attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection. All of the surrounding facts must be carefully considered.

Scrogham v. Colvin, 765 F.3d 685, 699 (7th Cir. 2014).

Plaintiff notes that in his case there is no legal contradiction between his receipt of both benefits. Under the SSA's Medical-Vocational Guidelines, a person of his age (55+) and work experience limited to light work will be deemed disabled. It is possible, plaintiff contends, that he was ready, willing, and able to work in a light position but simply could not find one. Plaintiff also notes that he did obtain work in December 2010 but was unable to handle the lifting and quit after just two days.

The ALJ did overstate things in finding the two applications "inherently inconsistent." As plaintiff explains, there is a way to reconcile them. However, I cannot conclude that this alone requires reversal. As Chief Judge Griesbach recently stated in rejecting a similar contention:

> the argument misses the mark because what's at issue is a layman's credibility, which is based on factual truths rather than ex post facto interpretations of regulations. As the ALJ repeatedly pointed out, the issue is very simple: the claimant certified to the unemployment agency, at a fixed date and time, that he was able to work. The claimant, at that point, had absolutely no understanding of the complex Social Security regulations that are being discussed here, and no idea that because of his age and 20 C.F.R. § 404.1568(d)(4), there might be some way to square his statement to the unemployment agency with a disability claim. He was simply saying he was able to work, just as his own physician said he was able to work. It is a concrete record of an objective, factual nature, that does not depend for its truth

or falsity on a <u>future</u> finding about Plaintiff's RFC.  These are matters of fact within the record, and the ALJ is entitled to account for them.

<u>Roovers v. Colvin</u>, No. 14-C-370, 2015 U.S. Dist. LEXIS 8538, at *13 (E.D. Wis. Jan. 26, 2015).

In <u>Roovers</u>, Chief Judge Griesbach found that the claimant provided only a theoretical reconciliation of the two claims.  Plaintiff's argument suffers from a similar flaw here.  As the Commissioner notes, plaintiff did not testify that he felt capable of light work but could not find a conforming job; instead, his testimony suggested that he was incapable of any level of work. Plaintiff specifically stated that he could not handle the quality assurance inspector job he obtained in December 2010, which required him to lift anywhere from two to 25 pounds, generally consistent with light work, <u>see</u> 20 C.F.R. § 404.1567(b), because of the lifting requirement and his pain.  (Tr. at 36-37.)  Thus, any error in finding the inconsistency "inherent" was harmless.  <u>See generally</u> <u>Halsell v. Astrue</u>, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as <u>enough</u> of them are[.]").

**4.    Daily Activities**

Finally, plaintiff takes issue with the ALJ's reliance on his daily activities, noting that the Seventh Circuit has "urged caution in equating these activities with the challenges of daily employment." <u>Beardsley v. Colvin</u>, 758 F.3d 834, 838 (7th Cir. 2014).  The ALJ did not equate plaintiff's activities with full-time work; rather, he compared them to plaintiff's specific allegations about how his impairments affected his functioning:

> [Plaintiff's] allegations that his impairments affect his abilities to squat, bend, stand, use his hands, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, understand, and follow instructions were not consistent with examination findings or his admitted activities of daily living, which as noted above in finding number three suggest a high level of daily functioning.

(Tr. at 18.) It was not unreasonable for the ALJ to find plaintiff's allegation that his impairments affected every single ability listed on the function report (Tr. at 230) inconsistent with the medical evidence and plaintiff's reported daily activities. Citing Murphy v. Colvin, 759 F.3d 811, 817 (7th Cir. 2014), plaintiff contends in reply that the ALJ was required to first ask him about the inconsistency before relying on it. In Murphy, the ALJ discounted the claimant's credibility because she took a vacation, without asking what she did on that trip. Id. In the present case, the ALJ specifically asked plaintiff about a variety of daily activities. (Tr. at 45-47.)

In sum, "although the ALJ's adverse credibility finding was not perfect, it was also not 'patently wrong.'" Schreiber v. Colvin, 519 Fed Appx. 951, 961 (7th Cir. 2013).

## B.    RFC

For his second challenge to the ALJ's decision, plaintiff argues that the RFC for medium work – which requires lifting up to 50 pounds, 25 pounds frequently, see 20 C.F.R. § 404.1567(c) – lacks support in the longitudinal record. He cites his own testimony regarding his unsuccessful work attempt in December 2010 and his limitations in performing household chores, as well as the exam findings of weakness in the right upper extremity. He contends that the ALJ pointed to no medical evidence to support his medium RFC.

Plaintiff is wrong. The ALJ specifically credited the reports of the state agency medical consultants, both of whom opined that plaintiff could perform medium work with no more than occasional overhead reaching with the right arm. (Tr. at 18, 77-78, 387.)[19] Plaintiff cites no

---

[19]In his reply brief, plaintiff notes that the consultants provided their opinions in 2011, meaning the ALJ relied on no evidence from 2012 and 2013. However, the argument in the main brief was that the "ALJ points to no evidence to support his medium RFC finding" (R. 10 at 20), not that the evidence the ALJ credited was stale. Arguments raised for the first time in reply are waived. See, e.g., Mendez v. Perla Dental, 646 F.3d 420, 423-24 (7th Cir. 2011). In any event, the ALJ did cite medical evidence from 2012 and 2013. (Tr. at 18.)

contrary medical opinion evidence. Further, the ALJ acknowledged the intermittent references to decreased strength in the medical records (Tr. at 17) but concluded, based on a longitudinal review of the record (Tr. at 17-18), that plaintiff remained capable of medium work. Finally, the ALJ discounted plaintiff's testimony regarding the severity of his limitations.

Plaintiff next contends that the ALJ erred in failing to consider all non-severe impairments in combination with the severe impairment. Specifically, he faults the ALJ for failing to include limitations based on medication side effects and depression. He notes his testimony that he experienced side effects of nausea, dizziness, sleepiness, loss of mental focus, and constipation (Tr. at 37) and had problems with his memory (Tr. at 43). He further notes that Dr. Stolarski found mild to moderate impairment in immediate memory (Tr. at 378), possibly due to his use of morphine (Tr. at 377). He contends that these impairments would cause problems with semi-skilled or skilled work.

The ALJ specifically considered plaintiff's reported memory problems and the mild to moderate deficits in immediate memory noted during the exam with Dr. Stolarski. However, the ALJ noted that despite these alleged problems plaintiff was able to engage in activities that required a significant amount of concentration, persistence, and pace. The ALJ also noted that plaintiff exhibited no problems with concentration or pace during the consultative exam and appeared to have no difficulties following along at the hearing. (Tr. at 15.) The ALJ further noted that Dr. Stolarski found no work-related mental limitations. Dr. Stolarski concluded that plaintiff could understand, remember, and carry out simple instructions; respond appropriately to supervisors and co-workers; maintain concentration, attention, and work pace; withstand routine work stressors; and adapt to change. (Tr. at 15, 380.) The ALJ also credited the opinions of the state agency psychological consultants, Drs. King and Donahoo, who found plaintiff's depression non-severe. (Tr. at 16.) Finally, as the

-35-

Commissioner notes, plaintiff cites no medical evidence that depression or medication side effects would limit his ability to work.[20]

Plaintiff also contends that the ALJ failed to account for his (non-severe) obesity.[21] As discussed above, the ALJ considered plaintiff's obesity at step three, finding no impact on any system's functioning. (Tr. at 14.) Plaintiff points to no evidence that his weight affects his ability to work such that the ALJ should have included further limitations in the RFC. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (affirming where the claimant did not specify how his obesity further impaired his ability to work). In his reply brief, plaintiff cites Goins v. Colvin, 764 F.3d 677, 681 (7th Cir. 2014), in support of the contention that the ALJ must evaluate obesity's cumulative impact, but in that case the morbidly obese claimant also suffered from pain and numbness in the legs caused by spinal disease. This case involves nothing of the sort.

Finally, plaintiff argues that the ALJ failed to provide the function-by-function assessment required by SSR 96-8p. 1996 SSR LEXIS 5, at *8. Plaintiff contends that the ALJ found him capable of medium work without first discussing his ability to lift 50 pounds. The ALJ credited the state agency consultants' opinions that plaintiff could lift up to 50 pounds (Tr. at 18, 77), rejecting plaintiff's subjective contention that he could not lift that much.

---

[20]In his reply brief, plaintiff contends that Dr. Stolarski opined that he was capable of understanding, remembering, and carrying out only simple instructions, which would preclude semi-skilled work. Dr. Stolaski found plaintiff able to handle simple instructions, but he did not limit plaintiff to simple instructions. (Tr. at 380.) Earlier in the report, Dr. Stolarski stated: "I evidence no problem with concentration and pace." (Tr. at 379.)

[21]At the hearing, plaintiff testified that he stood 5'10" and weigh 208 pounds. (Tr. at 30-31.) I note that, according to the National Institute of Health's Body Mass Index calculator, plaintiff's BMI is 29.8, which qualifies as overweight but not obese. http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

Plaintiff points to no medical evidence supporting a greater lifting restriction.  As the Seventh Circuit has noted:

> A function-by-function assessment of an individual's limitations ensures that the ALJ does not overlook an important restriction and thereby incorrectly classify the individual's capacity for work.  But an ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence.

Zatz v. Astrue, 346 Fed. Appx. 107, 111 (7th Cir. 2009) (internal citations omitted); see also Anderson v. Colvin, No. 13-C-788, 2014 U.S. Dist. LEXIS 151646, at *90 (E.D. Wis. Oct. 25, 2014) (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) ("[W]e agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.")).

For these reasons, I cannot find reversible error in the ALJ's RFC determination.

**C.      Appeal Council Review**

Plaintiff also challenges the Appeal Council's refusal to review the ALJ's decision.  Appeals Council review is governed by 20 C.F.R. 404.970.  That regulation provides, in pertinent part:

> (b)   If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

Id. § 404.970(b).  As the Seventh Circuit has noted, the regulation is not a model of clarity.  Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997).  In Perkins, the court of appeals explained that the regulation contemplates a three-step process:

> [O]nce the Council has assured itself that the proffered new material relates to the appropriate time period, the first step it must take is to decide whether the

submission is really "new" and "material." If it is, the Council must proceed under the second sentence to evaluate the entire record including that new and material evidence. If it concludes as a result of that evaluation that the administrative law judge's action appears to be contrary to the weight of the evidence "currently" of record – that is, the old evidence plus the new submissions – only then does it proceed to a full review of the case.

Id. at 1294. In Perkins, the claimant satisfied the first two steps: the evidence related to the proper time period and the Appeals Council treated it as new and material. However, he "failed at step three: upon its consideration of the entire record, the Council concluded that there was nothing before it that undermined the ALJ's earlier decision. It accordingly denied review." Id. The Seventh Circuit found no error of law in this method of proceeding and no basis for reviewing the Council's discretionary decision at the third step. Id.[22]

Accordingly, the federal court reviews de novo the Appeals Council's conclusion as to whether the evidence is new, material, and related to the period on or before the date of the

---

[22]The agency's Hearings, Appeals, and Litigation Law Manual ("HALLEX") confirms the procedure. When a claimant submits additional evidence, the Appeals Council must first determine whether it is new, material, and relates to the period on or before the date of the ALJ's decision. If the evidence is not new, material, or related to the period at issue, the Council will not mark the evidence as an exhibit and will include in the denial notice language specifically identifying the evidence and stating, as applicable, that the evidence was not new and/or material or did not relate to the relevant period. HALLEX I-3-5-20, Section A., http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html. If the additional evidence is new, material, and time-relevant, but on review of the entire record the Council does not find the ALJ's action, findings, or conclusion contrary to the weight of the evidence currently of record, the Council will prepare a denial notice, including language identifying the evidence and explaining that the evidence did not provide a basis for granting review under the "weight of the evidence" standard. The Council will also exhibit the additional evidence, preparing an exhibit list with the accompanying order. HALLEX I-3-5-20, Section B., http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html. Finally, if the Council finds that the evidence is new, material, and time-relevant, and on review of the entire record finds the ALJ's decision contrary to the weight of the evidence currently of record, it will grant review. The Council's determination that the ALJ's decision is contrary to the weight of the evidence currently of record is thus a predicate to "full" review of the case. See Luckerson v. Apfel, No. 99 cv 8483, 2000 U.S. Dist. LEXIS 12453, at *23 (N.D. Ill. Aug. 22, 2000). The regulations further state that when the Council decides to grant review, it will mail a notice to all parties stating the reasons for the review and the issues to be reviewed. 20 C.F.R. § 404.973.

ALJ's decision.  However, absent some error in the Council's legal conclusion, the Council's discretionary determination that the evidence does not undermine the ALJ's decision is unreviewable.  See, e.g., Alexander v. Barnhart, No. 01 C 168, 2003 U.S. Dist. LEXIS 10419, at *22 (N.D. Ill. June 18, 2003).

In this case, the Council's notice denying review stated, in pertinent part:

In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.  We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence.

We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. at 1-2.)

Plaintiff argues for de novo review, citing Farrell v. Astrue, 692 F.3d 767 (7th Cir. 2012). In Farrell, the Council stated "that it 'considered . . . the additional evidence . . . [and] found that this information does not provide a basis for changing the Administrative Law Judge's decision.'"  Id. at 771.  The court found the language ambiguous.  "On the one hand, it might indicate that the Appeals Council found the proffered new evidence to be immaterial, but on the other hand it might indicate that the Council accepted the evidence as material but found it insufficient to require a different result."  Id.  After reviewing cases from other circuits, the court interpreted the Council's decision as stating that it had rejected the evidence as non-qualifying under the regulation and proceeded along the lines indicated in Perkins to review that limited question.  Id.

Plaintiff argues that, under Farrell, I should assume that the Council rejected the evidence as non-qualifying in his case and proceed to consider whether the evidence was, in fact, new and material.  The Commissioner responds that Farrell is distinguishable.  First, the Council's order in this case includes language the Farrell order did not, which resolves the

ambiguity – "We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence."[23]  (Tr. at 1-2.)  The Commissioner contends that, had the Council found the evidence non-qualifying, it would not have proceeded to apply the "weight of the evidence" test.  Second, the Commissioner notes that in this case the Council followed the procedure in Section B of HALLEX I-3-5-20, see note 22, supra, which applies when the Council finds that the evidence is new, material, and time relevant, but does not provide a basis for granting review.  Specifically, the Council marked the additional evidence plaintiff submitted as exhibits 18F and 19F (Tr. at 4-5), which it would not have done had it found the evidence non-qualifying.  Because the Council accepted the evidence but concluded, in its discretion, that it did not provide a basis for changing the ALJ's decision, its order is unreviewable in court.

In reply, plaintiff cites Rodehan-Hendress v. Colvin, No. 14cv17, 2015 U.S. Dist. LEXIS 21737 (N.D. Ind. Feb. 24, 2015), in which the court rejected a similar argument by the Commissioner:

> [T]he Commissioner's argument that the Appeals Council somehow must have determined that the evidence was new and material before moving on to review the case fails because the Notice of Appeals Council Action clearly states "We have denied your request for review."  If a review had been granted, then a formal decision discussing whether the evidence was considered as new and material would have been written and new findings issued.  Thus, it appears that the Appeals Council failed to properly evaluate the new evidence, or, if it did evaluate the new evidence, it failed to issue a decision discussing the evidence.  For this reason, the court will now remand the entire case to the ALJ so that all of the evidence may be considered anew.

Id. at *20-21.  Plaintiff contends that, as in Rodehan-Hendress, there is no indication that the Appeals Council considered the evidence in his case because the Council's order states that

---

[23]In her brief, the Commissioner fully quotes the operative language of the Council's order in Farrell.  (R. 11 at 18.)  Plaintiff does not dispute that the Farrell order omitted the language quoted in the attached text.

it denied review. This argument skips a step in the analysis. The Council need not grant review every time it finds additional evidence new, material, and time-relevant. Rather, it will grant review if it <u>also</u> finds the ALJ's decision contrary to the weight of the evidence "currently" of record (the old evidence plus the new submissions). <u>Perkins</u>, 107 F.3d at 1294. Put another way, the Council can deny review while still finding the additional evidence new and material. <u>Perkins</u> rejected the contention implicit in plaintiff's argument – that the Council "either [has] to refuse altogether to look at the additional materials, or it [has] to give plenary appellate review with all the trappings." <u>Id.</u> at 1293.

Plaintiff points out that, unlike in <u>Perkins</u>, the Council's order in this case does not specifically state that it "evaluated the entire record including the new and material evidence submitted." 107 F.3d at 1294. Rather, the Council stated, "we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." (Tr. at 1.) Plaintiff contends that nothing in the order says that the Council reviewed the "entire record." However, the next sentence of the order states that the Council "considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence." (Tr. at 1.) And, in the preceding paragraph of the order, the Council stated that it would review a case if it "receive[d] new and material evidence and the decision is contrary to the weight of all the evidence now in the record." (Tr. at 1.) Finally, plaintiff offers no reply to the Commissioner's contention that Council would not have exhibited the additional evidence had it not first found the evidence new and material.

Because the Council's order, fairly read, shows that Council found the evidence new and material but nevertheless made the discretionary decision not to grant review, I may not review the Council's decision.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 1ˢᵗ day of May, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge